## No. 162.

### SUCCESSION OF PATRICK CONDON.

1. Under the laws of this State, aleatory or gaming contracts are void.
2. Whether a contract be aleatory or not, is a question of intent.
3. A contract for the sale of cotton futures, where neither delivery nor payment of price is contemplated, but only an adjustment of differences, is aleatory and void.
4. The intent to wager may be implied, and circumstantial evidence is admissible to show its character.
5. The courts are not bound, in these cases, by the form or expressions of the contract, nor by Cotton Exchange rules.
6. The manner of settling prior transactions between the parties, similar to the one under investigation, may be considered.
7. Likewise, the manner in which the particular contract itself has been adjusted.
8. So, also, the fact that the parties were in no condition to make or accept delivery or payment.
9. In such a case, the particular contract being one out of many, all going to form the business known as dealing in futures, the general character of that business is a proper subject of investigation.
10. The fact that a dealer in futures fills or executes, through the agency of some other firm, the orders he has received, does not render such dealer a broker.

*Appeal from the Civil District Court, Division B.*
*Houston, Judge*

*H. P. Dart* for succession of Condon, appellant.

*A. B. Phillips* for Bignon, opponent, appellee.

McGLOIN, J.—The matter at issue in this case is the validity of a certain promissory note for $700, executed by Patrick Condon, now deceased, in favor of A. E. Bignon. The defence is that said note represented a balance against Condon upon speculations in cotton futures, which constituted contracts aleatory in their nature, and not enforceable. It appears by the proof that Condon dealt for some time with Bignon, the latter representing, or now claiming that he did represent, the New York firm of B. R. Smith & Co. Said dealings were in the nature of purchases and sales of what are known as cotton futures. The note sued upon is the one figuring upon the following account:

MR. P. CONDON IN ACCOUNT WITH A. E. BIGNON.

| 1879. | ——DEBIT.—— | |
|---|---|---|
| Oct. 10—To bal. due me as per acc't rend. this day | $1055 21 | |
| Dec. 4—To am't loss on 100 July delivery | 369 75 | |
| "    "    "    "    "    " | 153 88 | |
| | | $1578 84 |

| 1879. | ——CREDIT.—— | |
|---|---|---|
| Oct. 13—By am't cash rec'd from you | $ 355 21 | |
| Nov. 29—By am't his note | 700 00 | |
| Dec. 3—By cash rec'd from you | 250 00 | |
| "    9—    "    "    "    " | 273 63 | |
| | | $1578 81 |

| 1879. | | |
|---|---|---|
| Dec. 9—To your note due | | $ 700 00 |

E. & O. E.

*New Orleans, December 9th, 1879.*                          A. E. BIGNON.

Articles 2982 and 2983, La. Civil Code, declare all contracts, aleatory in their nature, to be of no legal effect. If such be, in fact, the nature of the conventions now being considered, we must deny to the note that has sprung from them all judicial enforcement. What are usually termed *gaming* or *wagering* contracts are generally reprobated by the laws of civilized nations; and it can make no difference in what particular shape such agreements present themselves, so far, at least, as their reprehensibility is concerned. The force of such legislation should be the same, whether the gamesters style themselves merchants, and place their stakes upon the future con-

tingency of a rise or fall in the market price of any commodity, or, on the other hand, place their ventures upon the turn of a card or the cast of a die. Indeed, if it be wrong or against public policy to rest one's hopes for fortune, or to venture what one already has, upon matters of mere chance, that species of gaming which intrudes itself into the places of commerce, and mingles itself with the flow of the legitimate business of a country, must be by far the most dangerous of all wagering. It is so, because it scorns the secrecy of mere card-playing, and holds its glittering temptations perpetually in the eyes of men; because it escapes the odium usually belonging to common gambling, and claims to rank as a branch of legitimate commerce; because it deals in millions, where other gaming handles only its thousands or hundreds; and because its effects bear not simply upon the player himself, with his own immediate family, but upon the entire community as well, inasmuch as it perpetually menaces the harmonious working of the law of supply and demand in the matter of regulating prices.

Courts which would direct their efforts at the enforcement of legislation of the character under consideration, against the mere card-player alone, or the ordinary better of any kind, and shrink from extending a similar treatment to his more dangerous and powerful brother, the commercial gambler, would merit the contempt of honorable men.

When, however, the judicial tribunals are called upon to scrutinize particular contracts between merchants, or between persons styling themselves such, with a view to ascertaining whether such contracts be aleatory or not, the task is often one of great difficulty. The element of chance must enter largely into all commerce, and men, for legitimate purposes, may enter into conventions that are unimpeachable, but which yet must of necessity be affected, as to the pecuniary interests of those concerned, by the future conditions of the markets. Thus, the merchant, laying in his customary stock, may profit or lose by fluctuations in prices, before his wares are entirely disposed of. The same merchant, unwilling to charge himself

with the expense or trouble of caring for a great accumulation of merchandise, may stipulate for future deliveries, in lots and at times to suit his trade. In this last event the profit or loss of purchaser and vendor must depend largely upon subsequent variations in prices.

The legitimate trader, however, in these cases, differs from the commercial gambler in this, that, while he assumes, possibly against his will, the risk of future fluctuations, his expectations of profit do not rest alone upon the chance of a rise. He acquires at one figure, which, by reason of the largeness of his dealings, or for other reasons, is less than that at which the generality of men can acquire, and he sells at an advance to those who seek him. The commercial gambler, on the other hand, contemplates no such legitimate course, or methods of securing his profits, but founds his hope of fortune alone upon the chance of a fluctuation in prices favorable to himself.

There is, likewise, a character of speculation which, while it rests its expectations upon the chance of future variations in prices, is, nevertheless, not to be designated as commercial gambling. A man may believe that rising markets are ahead, and invest his money in purchasing with a view to taking advantage of the rise he foresees. In such a case, however, he executes a real contract of sale, acquires and takes property ; and the one from whom he purchases has no remaining interest in the transaction, except to receive the stipulated price ; and between the two there are no conflicting hopes to balance in the scales of chance. So, the mere speculator may be unwilling to charge himself with the custody of the property while he awaits the coming advance, and therefore he may stipulate for a future delivery. Even yet, however, he differs from the commercial gambler. The speculator in the case last supposed makes a true contract of sale, and the price is absolutely fixed and paid, or to be paid, no matter what may be the course of the market. So is the property itself to be similarly and certainly delivered. The agreement itself, whatever may be the eventual profit or loss to either party, has in it nothing of the

element of chance. The commercial gambler, however, really makes no sale, and contemplates no delivery or receipt, and no payment of a price. He merely selects an opponent at play, and pits his own judgment against that of the latter, just as one who bets at cards or upon a horse-race might do, only the matter upon which the stakes are laid in his case is the state of the market, as to some particular commodity, at some special date in the future. With him, payment either way depends solely upon chance, as does also the amount, if any, which is to be paid.

Thus it will be seen that as to the contracts themselves there is no confusion, and that, in fact, the lines of distinction are clearly drawn. The difficulty lies generally in ascertaining the intent of the parties, as a question of fact, for upon such intention all cases of this nature must turn.

In striving, however, to solve this issue, it must not be forgotten that these matters are not beyond the pale of inference. The mutual intention of gaining is not, and need not always be expressed, but it may be implied from circumstances. In other words, in striving to find out what was the actual intent in such cases, the courts may have recourse to circumstantial evidence, with as much profit and propriety as they could do so in any other investigation after the facts. Indeed, in an inquiry such as this, where the scrutiny is not held in the interest of parties, but in that alone of public policy, the tribunals are in no manner bound by the expressions that may be in the particular contracts that are being judged. It is not only possible, but very usual for parties to attempt to clothe their vicious contracts with the forms and appearances of legality; and in such cases the courts are not precluded from searching rigorously into such deceptions, in order to prevent the defilement of their dockets by suits which are really illegitimate, although wearing the garb of legitimacy. To hold otherwise would be to make wrong-doing invincible the moment it enters into an alliance with cunning. It would also reduce the laws under consideration, and others of a similar character, to the

condition of mere dead letters; for men are ever shrewd in the matter of disguising whatever they have done that is of an evil nature.

The case that is now before us discloses many facts that come properly within the domain of circumstantial evidence. The parties had had together prior dealings of the same kind as those under investigation, and which were carried forward to final completion or determination. As such anterior transactions were, it may be presumed that the ones being considered were intended to be. In all such antecedent contracts, there was simply a settlement for differences in prices, and no delivery of goods or payment of purchase money. See Buras' Appeal, 55 Penn. 298.

The very note sued on is the result of similar adjustments, representing a balance against Condon, after partial payments, upon settlements of differences in prices, all without deliveries of payment of considerations. While it is true that parties who have made a legitimate contract for future delivery, may subsequently agree to settle it by simply paying differences, and while it may be fairly claimed that the rights of parties in such cases are to be determined according to the intention as it originally existed, yet it cannot be denied that, as result discloses cause, so the manner in which persons eventually execute their contracts may be fairly inferred to be the one in which it was originally intended that they should be executed.

The parties in this case, at the time of their transactions, had no cotton on hand to meet the obligations assumed, nor did they at any time subsequently acquire any with a view to meeting their contracts. Condon was not a regular operator in actual or spot cottons, and he was without the means to handle the same in any considerable quantity. The dealings between him and Bignon were all upon the market in New York—a place wherein Condon, a resident of New Orleans, had no facilities for receiving or holding cotton. Incidents such as these, while any one of them alone might not be sufficient to determine the cause, are certainly corroborative of each other, and of other circumstances which may exist with them.

A strong inference, in our judgment, arises from the fact that these particular contracts form part of a line of dealing that has grown to be immense, and to which alone the term "cotton futures" does, or can apply. They form, as it were, drops in a mighty tide of business that flows through the cotton exchanges of this city and of New York. Their nature may, therefore, be fairly judged by the general character of the class or kind of dealings with which they are thus assimilated. The court may legitimately examine into the general characteristics of this business as a whole, and impute, in default of sufficient contradiction, such general characteristics to each particular agreement that goes to make up the aggregate. It is shown affirmatively in this case that actual delivery and payment of price is a matter of rare occurrence in the history of these transactions. It is also shown that it would not be possible to bind this business down to actual delivery, because the total of its operations exceeds many times the aggregate of all the cotton to be found in the country. This, it will be borne in mind, is in addition to the commerce in spot cottons, which must at least be commensurate to the amount of the staple actually grown.

How can it be reasonably contended that a system of dealing in futures, which, in its proportions, is so infinitely beyond the capacity of the nation for the production of the article it claims to handle, can be one which, as a system, does not contemplate or involve a mere wagering upon prices?

All of these facts we consider as establishing, by sufficient presumption, the accountant's contention, and as making good his defence, in default of contrary proof from the holder of this note. In other words, we consider that they have shifted the burden of proof, and that, being uncontradicted, they justified the judge *a quo* in his finding.

The rules of the New Orleans Cotton Exchange have been submitted to us and argued upon by both parties. As the contracts, however, were made before the coming into force of these rules, and upon the markets of New York, we do not see

the connection they can have with this case. Even if, however, they be substantially similar to those in operation in the exchange at New York, and the contracts between Condon and Bignon were governed by the latter, this would not affect our opinion.

The reference to any such a set of rules can have no further effect than to incorporate them, by reference, into the agreements themselves. They certainly can have no greater force than similar express declarations, if actually embodied in the conventions. We have seen, however, that the declarations of such contracts cannot debar the courts from searching after the real intention of the parties, and determining the controversy accordingly. The betters in these cases might purposely draw their written contracts so as to cover delivery as well as a settlement of differences, and to regulate the former with all the elaboration that is found in these rules, and yet all the while the intention might be in fact to gamble.

If this mode of dealing be essentially in the nature of wagering, and if, as such, it be reprobated by law, it is hardly to be imagined that persons forming public rules for the government of the business would incorporate among their regulations a formal confession of the very illegality by which it was threatened. On the contrary, some attempt to hide away its illegitimacy should naturally be expected. To accomplish this latter purpose, the most convenient plan would be to frame such rules, and the contracts thereunder, so that the latter would possess at least ₊the seeming of legality. The framers would naturally incorporate into their rules and forms, stipulations for delivery and payment of price, and others of a similar nature, which usually mark conventions that are of validity. Parties that merely contemplated gambling could, as they are doing every day, put up their bets upon the exchange; and consequently, under these rules, and certainly these regulations, could not alter the real nature of their dealings, any more than they could control absolutely the minds and wills of such contractants. The mere fact that the holder of such a simu-

lated contract may subsequently determine to stand upon the letter of his convention, and demand or tender delivery, does not exclude the idea that, at the inception of the matter, both parties intended a simple settlement for differences without such delivery and without payment of price. The courts, upon the presentation of this issue of illegality, will not stop their investigations, any more for being in face of such rules, than if confronted by a written convention, which similarly reserves a right of which it is asserted both parties intended not to avail themselves. So, the circumstances would be appealed to for light, and those that we have already considered would be as potent against these rules as they could be against such a contract that was express and complete without reference. As the burden of proof can be shifted by circumstantial evidence in one case, so, likewise, may it be shifted in the other.

These formal rules do not reduce a particle the great volume of the future business, or add one bale to the actual crop. They do not do away with the fact that, despite their clauses, this vast business is conducted almost entirely upon settlements of differences, and with so few deliveries. They could not wipe away the history of the past transactions between Condon and Bignon in this case, or strike out one feature from the peculiarity of their relations towards each other and towards the contracts themselves.

It is contended, in this case, that Bignon was simply a broker, or agent, of Condon, and that, as such, he is entitled, under any circumstances, to reimbursement for what he has paid out for account of his principal. The laws of this State are express and emphatic in their condemnation of gaming. The constitution of 1879, art. 172, declares gambling to be a vice, and commands the legislature to pass laws for its suppression. We are not prepared, under any circumstances, to hold that any one who is fully cognizant of the nature of transactions of this nature, and hence knowingly brings them about, can escape being viewed as a participant in transactions which the law condemns, and appeal to the courts for the

enforcement of his rights or interests in, or growing out of, such obnoxious dealings. However, we do not consider, from the evidence, that Bignon was the mere agent of Condon, making disbursements as such. He had a standing connection with the New York house, covering many dealings, and for many persons. He kept a general and running account of losses and gains with that house, and made stated settlements with them. That house had accounts with no one but Bignon, in connection with such matters; rendered accounts to him, drew upon him, and were drawn upon by him, according as the balance of their accounts varied one way or the other. On the other hand, Condon and Bignon, likewise, dealt with each other exclusively. From Bignon, and in the name of Bignon alone, Condon received all accounts, and between them it was that losses or gains were adjusted and paid, or settled by note, as the case might be.

Whilst it was, of course, necessary for Bignon to have some one in New York to act for him, who that representative was does not seem to have concerned Condon, who sought for, and dealt alone with Bignon. Under such circumstances, we cannot view the latter in any other light than as a contracting principal, at least so far as Condon was concerned, who was making use of B. R. Smith & Co., to transact business for him in New York, as a bank here, receiving foreign bills to collect, might send such bills to a foreign bank for presentation, etc.; or as a commission merchant here might consign his principal's cotton to Liverpool for sale, on that market, by his own correspondent.

The judge deciding this case below seems to have disposed of this case in accordance with the principles herein propounded, and his judgment is affirmed, with costs.

## CONCURRING OPINION.

ROGERS, J.—I deem it proper to refer to some extent to the evidence in this case, because the appellant urges two grounds in opposition to the claim of the appellee: because he acted

as a broker or intermediary in the transaction; and because the note represents money paid by him for Condon's account.

"The broker or intermediary is he who is employed to negotiate a matter between two parties, and who, for that reason, is considered as the mandatory of both." C. C. 3016. "His engagement is double." C. C. 3017.

It appears from the testimony that the opponent, Bignon, had an account with a firm styled B. R. Smith & Co., New York; that Condon's name did not appear as a purchaser upon their books. All accounts were made out in the name of Bignon, who was a regular customer of this New York house, who looked to him for all losses, and shared with him one-third of their commissions. The relations of Bignon with the New York house are general, for instance, as testified to by one of the witnesses:

"We had constant settlements during that time. We, for instance, pay here in New Orleans, some parties' profit, and collect from others' losses, which, of course, makes a settlement. If the difference was against him, Mr. Bignon collected more than he paid out. He remitted by buying a bank check; otherwise he would draw upon them and sell his check to a bank here." * * "We make a prompt settlement to preserve our credit with the house in New York."

It is very clear that Bignon cannot be regarded as a broker in this transaction. If he bought from the house in New York, and, when instructed by Condon to purchase, bought from himself, he became a principal. Beal *v.* McKiernan, 6 La. 417.

If he acted as broker, and hence necessarily for both Condon and B. R. Smith & Co., he was not responsible to either party for the price or thing sold. C. C. 3018; Buddecke *v.* Harris, 20 La. An. 564; Currey *v.* Hoover, 10 La. An. 437.

It will be seen from the account furnished by Bignon, which my colleague has given at length, that the entire account is made up of *losses*, for which, *as the broker of* Condon, he was in no manner responsible. We must, therefore, regard him as a principal, and examine into the contract between him and Condon.

Did Bignon sell Condon any cotton for future delivery? Testifies the witness: Question—"Do you know what those purchases and sales were?" Answer—"Yes." Q.—"What were they?" A.—"Well, they were purchases or sales (as they may be) of *future delivery contracts* under the New York Cotton Exchange." Q.—"Do you mean to say these were the number of actual bales bought in New York—actual, identical cotton?" A.—"No, it was the *purchase of a contract.*"

From this testimony and that of others, it is clear that Condon advanced so many dollars in May, representing a certain value of so many bales cotton on that day, called "Septembers" or September delivery. There was no agreement other than what has already been referred to. It was not intended that either party should await the day of delivery, because no cotton was on hand; but the sum advanced by Condon was either too much or too little, as the daily market values might indicate. He might find himself either enriched or impoverished at any hour of the day; he could be called upon at any moment for more funds, or he might retire with a profit. So that we find him in December heavily in debt, on his May transactions; for a September delivery. Not a bale of cotton accounted for, and the whole affair predicated upon the purchase of a *future contract*, indicating purely and simply a difference of price, stipulated at the time of contract, and the market price at the future time named for delivery.

It is not my purpose to go beyond the merits of this case. The law regarding contracts for future delivery cannot be misunderstood. That they are valid and can be enforced when made *bona fide*, and with the essential requisites of all contracts of sale, no one doubts; and that it is equally proper to adjust an originally valid contract, by agreeing not to enforce a specific performance, but to pay a sum in damages or a difference, is also clear. But here we are told, not that cotton is sold or purchased, but a future contract, which represents nothing, is passed from hand to hand, and assumes no character, except such as the caprice of individuals may choose to give it.

I have had my attention called to the case of Warren v. Meyer, Weis & Co., which I decided while occupying a seat on the district bench. I adhere entirely to the judgment therein rendered; but the facts of the case now before us are different. In that case, Warren claimed that he had deposited with Meyer, Weis & Co., *for safe-keeping*, one hundred and ninety-five dollars. It appeared on the trial that Meyer, Weis & Co. were not bankers, engaged in the business of receiving money on deposit for safe-keeping, but were cotton factors and commission merchants, doing business in this city and in New York; that they purchased, by order of Warren, *cotton* in New York, at a stipulated price, delivery in August, 1879; that Warren accepted the purchase, and deposited the money with them on that account; that in the following month, Warren ordered them to sell the *cotton*, which they did; that they had no pecuniary interest in the matter, except their commission, and in all of which they acted as agents. The testimony showed such facts, and the judgment was rendered in accordance.

In the case now before us there is no shadow of testimony to show a purchase of a single bale of cotton, or an intention to sell or buy on either part; for, be it remembered, that Bignon was operating in his own interest, with simply a credit with a New York firm, not for *cotton*, or an equivalent for cotton, but simply in the matter of *losses* or *profits* on *future contracts*.

This record presents no consideration which would warrant a dissent from the decree of the district court. I, therefore, concur in the decree rendered by my colleague.

---

ON APPLICATION FOR REHEARING.

McGLOIN, J.—The opinion of the honorable District Court for this Parish, Division C, rendered in the suit of Brittin & Bright v. Johnsen, has been cited, in support of an application for a rehearing. The high esteem in which we hold the learned judge who decided that case, has led us to consider

his opinion carefully, and to examine again most closely the questions involved.' We may say that we consider that there is, in the main, no great difference in matters of law between the opinion in that cause and the one already given by us in this. Both agree that where the original and mutual intention of the parties is not to deliver and to pay the price, but merely to settle for differences, the conventions are aleatory and void ; that the question is one of fact, and that it is not dependent upon or concluded by the form or wording of the contract itself.

The proof in the case of Brittin & Bright v. Johnsen does not seem to have been in all respects similar to that which appears in this record. We do not propose to criticise the findings of our learned brother who decided that litigation upon the particular facts that were before him, as each transaction must be determined by its own circumstances. So far as our own opinion is concerned, as originally rendered, and as based upon the facts of this case, renewed examination and further reflection have but strengthened us in our convictions.

We held that the intent to gamble might be implied, and that it was susceptible of establishment by circumstantial evidence. It is a matter of most frequent occurrence that persons contracting, say or do nothing to express an intent which each has and knows the other to have, relative to matters of essence to their agreements. Thus, one man enters the place of another, and orders one or more barrels of flour sent to his own house or store. Both are silent as to price. The intention, however, that the transaction should be a sale, and to accept the market or usual price, exists, and will be inferred ; so, in the vast majority of purchases, there is nothing mentioned with regard to delivery or terms of payment ; yet it must be held that delivery, and that immediate, was contemplated, and payment as well—the latter according to usage. In this manner, illustrations might be indefinitely multiplied, but those given are sufficient.

Applying these principles to the case at bar, it is evident

that parties dealing in futures may both have the intention of gaming, and such intention may be mutual, although no words expressive thereof are passed. In searching for the undisclosed intent, the court knows of no guide except the general rules of evidence, and can go forward in no manner differently from that in which it would proceed, were it a sale of flour, as above supposed, which was being investigated. The same circumstances and considerations which would be of force in the one case, must serve us in the other.

In the matter of the order for flour, the judge could usefully inquire into the nature of the original possessor's business, and, were the latter only recently established, proof as to the general character and usage of the particular trade in which such possessor had embarked, would be acceptable. So, in this case, we regarded the proof given, that dealing in futures had become an established and extended business, involving transactions by the thousand, and purporting to handle cotton by the millions of bales ; that in the course of this business, settling by payment of differences, was the rule and usage, and delivery and payment matters relatively of rarest exception ; that its dealings involved in one month many times more cotton than was in the entire crop of the year, and that it could not possibly be conducted upon the scale attained, were delivery and payment actually demanded in any great number of cases. The suggestion that each of these future contracts is assignable, and that they are frequently so assigned, and that, as each transfer is registered, the appearance is that much more cotton is sold than is actually so disposed of, cannot affect our judgment. In the first place, no proof of this circumstance is in the record of this case; and if it were, it would not do away with the fact that thoroughout each line of assignments, and at the actual end of the contract's life, there is almost, without exception, the intent to adjust by settlement of differences alone. The actual usage of this trade would not be touched, and the fact might also remain that the aggregate of contracts themselves, in connection with the spot business,

would remain far beyond the amount of cotton available in the market for delivery, or even far beyond the total itself of the entire crop.

In the matter of the flour, the court would admit proof of prior dealings between the parties and its character, showing that on previous occasions the defendant had given similar orders, and in every instance, without demur, had paid the grocer's bill, drawn up in accordance with the market price. So, in this case, we regarded and gave effect to the testimony, etc., showing that Condon and Bignon had had in the past, dealings similar to those under investigation, and that these antecedent transactions had been adjusted, invariably, and as a matter of course, by simple settlement of differences.

Stronger than all, however, if, in the case of the flour, without fresh conference, the receiver had sent and the deliverer accepted a promissory note, covering the value of the flour at current rates, could it be contended that this circumstance would not establish conclusively the original intent as determining the nature of the transaction? In the matter now under investigation, the dealings that serve as a basis for the note sued upon, being accompanied, at the moment of their birth, with no particular discussion as to delivery and payment of price, were disposed of *as a matter of course*, by simply charging differences, and this last without so much as a mention of delivery or payment. If the original intent were to deliver and pay, the natural outcome of each transaction, in default of subsequent modification, would be delivery and demand for the entire price. Any change in the original purpose would be the offspring of renewed negotiation, and such negotiation and its result would be made to appear. Here, however, instead of coming together for new arrangements, the pretending vendor sends upon printed and formal blanks to the pretending purchaser a mere account of differences, and this is received by the latter as the natural, proper and expected conclusion of the matter. Under such circumstances is the presumption not invincible, that the settlement was in

strict accordance with the original and mutual intent, harbored by each contractant, and each knowing at the time that expression was a matter of no necessity? Such a state of facts, even though disclosing itself in one particular case, goes far to strengthen the conclusion that the common, and almost universal usage in this cotton-future business is to settle solely upon differences; for, otherwise, how would the parties to this controversy have dispensed in the manner they have done, with any stipulation, original or subsequent, waiving delivery and payment? It shows that the usage was so general and so universally conceded and understood, that it sufficiently determined these questions, entering by implication into their contracts, and rendering express discussion and convention matters of supererogation.

Under such circumstances we can see no pertinence in the authorities which declare that a contract, originally lawful, may be finally adjusted by a mere payment of differences. To give such authorities applicability in face of such a settlement, it should appear that this subsequent understanding was in fact arrived at; and they can have no bearing upon a controversy wherein, as in this, there was in reality an entire absence of any such subsequent modification of the original convention.

Furthermore, the supposition that one tendering a sale of cotton-futures may come in contact with a person intending really to take the cotton, and pay therefor, cannot militate against this position. It may possibly be true, that where one of the parties to such a contract contemplates a strict and literal performance, the transaction is not void. In such event, when the time for performance arrives, such a *bona fide* purchaser calls for his cotton, and the features peculiar to this case do not and cannot arise. Such a controversy would be determined according to its own facts, but they would not be the facts that are disclosed in this record.

We adhere to the views originally expressed relative to the effect of the rules of the Cotton Exchange. They are not con-

clusive, and we are not compelled to respect them as an impenetrable veil, which is to conceal successfully the gambling intent in every case. We are dealing with a system of business which, by the evidence in this case, seems, on the whole, to be essentially of a gaming character; and it would be an extraordinary exposition of judicial weakness were any formal and empty rules to serve as a complete protection, in favor of wholesale gambling, and against judicial scrutiny and condemnation.

Rehearing refused.